■ The People of the State of New York ex rel. Howard Glenn Blake, Alleged to be Larry Wayne Barnett, Respondent, v George E. Pataki, as Governor of the State of New York, Appellant. [870 NYS2d 48]—

584

On April 8, 1976 an individual using the name Larry Wayne Barnett (hereinafter Barnett) pleaded guilty to forgery in the state of South Carolina, and was sentenced to seven years' imprisonment, to run concurrently with an earlier sentence imposed for grand larceny. On August 18, 1976 Barnett escaped from custody and fled to New York. In 1993 South Carolina officials prepared extradition papers, but the then-Governor, Carroll A. Campbell, Jr., refused to sign the authorizations necessary to initiate extradition, determining that "exceptional circumstances" weighed against extradition, including Barnett's rehabilitation, long-term marriage, work history, and severe health problems.

No further action was taken by the State of South Carolina to extradite Barnett until October 2005 when an individual using the name Howard Glenn Blake, who was returning from vacation, was detained at JFK Airport after a computer entry indicated that he was wanted in South Carolina as Larry Wayne Barnett. Subsequently, the South Carolina Board of Corrections assembled the necessary certified records, including a certified copy of a certificate of extradition for Barnett for the crime of escape from confinement, a judge's affidavit attesting to the charge of escape, and a copy of an arrest warrant for escape, and forwarded them to the office of the present Governor of South Carolina, Mark Sanford. On January 9, 2006 Governor Sanford signed a Governor's requisition, seeking extradition of

Barnett. On January 12, 2006 then-New York State Governor George E. Pataki signed a Governor's warrant for extradition of "Larry Wayne Barnett, also known as Larry Wayne Barnette, also known as Larry W. Barnett, also known as Larry W. Barnette, also known as Wayne Barnette, also known as Howard Glenn Blake" to South Carolina on the charge of escape. On February 20, 2006 the Suffolk County Fugitive Squad arrested the petitioner, and he was arraigned on a fugitive complaint. The petitioner was released on bail of $5,000.

On April 27, 2006 Blake, alleged to be Barnett (hereinafter the petitioner) filed an amended petition for a writ of habeas corpus, seeking to vacate the extradition warrant upon the grounds of fugitivity, waiver, estoppel, and due process. He reserved his right to contest whether he was the person named in the extradition warrant. The Suffolk County District Attorney's Office opposed the motion. The Supreme Court sustained the writ, finding that petitioner was not a fugitive from the State of South Carolina because, in 1993, "South Carolina, through the very clear, unambiguous, unequivocal, unchallenged actions of its governor, affirmatively stopped seeking the return of the petitioner." We now reverse, and remit to the Supreme Court for further proceedings.

"It is well established that once the Governor of an asylum State has directed extradition, 'a court considering release as habeas corpus can *do no more than* decide (a) whether the extradition documents on their face are in order; (b) whether the petitioner has been charged with a crime in the demanding state; (c) whether the petitioner is the person named in the request for extradition; and (d) whether the petitioner is a fugitive' " (*People ex rel. Strachan v Colon,* 77 NY2d 499, 502 [1991], quoting *Michigan v Doran,* 439 US 282, 289 [1978]; *see People ex rel. Angell v Scoralick,* 265 AD2d 354 [1999]). A fugitive from justice is a person who has committed a crime while physically present within a state and has fled from that state to another without waiting to abide the consequences (*see People ex rel. Strachan v Colon,* 77 NY2d at 502). Fugitive status does not depend upon the motive for departure from the state, or upon the question of whether or not charges were pending prior to departure—it suffices that the person left (*id.*). The records in support of the South Carolina Governor's warrant are sufficient to support then-Governor Pataki's finding of fugitive status (*see* CPL 570.08). The Supreme Court improperly determined that the then-Governor of South Carolina essentially pardoned the petitioner. There is nothing in the record to support this conclusion. Indeed, the Suffolk County District Attorney's Office

averred that then-Governor Campbell denied an application for pardon (*see* South Carolina Const, art IV, § 14 ["With respect to clemency, the Governor shall have the power only to grant reprieves and to commute a sentence of death to that of life imprisonment. The granting of all other clemency shall be regulated and provided for by law"]).

We acknowledge the existence of extenuating circumstances in this case, as set forth by our dissenting colleague. However, because there are only four issues cognizable in a habeas corpus challenge to a Governor's extradition warrant, the petitioner must make his equity arguments in the South Carolina forum (*see California v Superior Court of Cal., San Bernardino Cty.,* 482 US 400, 407-408 [1987] ["extradition proceedings are . . . 'emphatically' not the appropriate time or place for entertaining defenses or determining the guilt or innocence of the charged party . . . [for] [t]hose inquiries are left to the prosecutorial authorities and courts of the demanding State"]); *Biddinger v Commissioner of Police of City of New York,* 245 US 128, 133 [1917] [courts of extraditing state may not consider statute of limitations' defense]; *Strachan v Colon,* 941 F2d 128, 131 [1991] [habeas court could not consider 40-year laches defense to extradition]).

The petitioner's remaining contentions are without merit. Mastro, J.P., Santucci, and Eng, JJ., concur.

Belen, J. (dissenting and voting to affirm the judgment, with the following memorandum): The petitioner, who is afflicted with terminal lung cancer, hypertension, and the after-effects of a stroke, is the sole support of a disabled wife and daughter. He seeks to affirm the vacatur by the Supreme Court of a South Carolina extradition warrant for offenses he committed more than 30 years ago. While I understand that the majority is concerned with ensuring that the doctrine of Full Faith and Credit be preserved between the states and wishes to take no action that could be seen as impeding cooperation between the states, this case truly stands outside that concern. The facts of this case are comparable to no previously reported case and are unlikely to see repetition, much less serve as precedent for any future case.

A fugitive is one who has been charged with committing a crime in one state and fled to another without waiting to abide the consequences (*see* US Const, art IV, § 2; CPL 570.06, *People ex rel. Strachan v Colon,* 77 NY2d 499 [1991]).

This petitioner, who escaped from the South Carolina stockade on August 18, 1976 while serving a sentence for forging a check in the amount of $495, unquestionably meets this definition.

This petitioner's sentence had included time for violation of probation for a grand larceny conviction arising from breaking into a house and stealing a television set and tape player. The record is devoid of any legal or factual reasons why that sentence was not appropriate in 1976.

Thus, when South Carolina moved to extradite the petitioner in 1993, New York State did not stand in its way, although the petitioner had lived here openly and without serious incident for 17 years. He was a fugitive from South Carolina's justice and there was no basis to deny extradition which, under normal circumstances, is purely a ministerial act on the part of the asylum state (*see Puerto Rico v Branstad,* 483 US 219, 226-227 [1987]; *People ex rel. Quarterman v Commissioner of N.Y. City Dept. of Correction,* 183 AD2d 736 [1992]).

Although New York State was ready, willing, and able to extradite the petitioner at that time, the Governor of South Carolina, Carroll A. Campbell, Jr., declined to accept the petitioner for extradition, notifying his Commissioner of Corrections by letter dated April 8, 1993, stating, in full, as follows:

"Dear Parker:

"My office has been contacted with reference to Larry Wayne Barnett.

"Mr. Barnett escaped from the Anderson, S.C. Stockade in 1976. He has recently been apprehended in the State of New York. It is my understanding that the S.C. Department of Corrections will seek extradition of Mr. Barnett should he chose [*sic*] not to execute a waiver.

"Fully cognizant of the interests of the Department in this matter, I have reviewed the circumstances of this case, and believe it would be neither in the best interests of the Department, nor in those of the State of South Carolina, to pursue extradition of Mr. Barnett. Consequently, I will not sign the authorizations necessary to initiate extradition in this case, based upon my consideration of the exceptional circumstances.

"Initially, Mr. Barnett apparently has rehabilitated himself. He has had no significant encounters with the criminal justice system, nor with its agents, since his escape. He is, and has been, gainfully employed in the State of New York. Given the role of the Department of Corrections, I believe these factors merit consideration.

"Secondly, Mr. Barnett suffers serious health problems which will require major surgery in the near future. If returned to South Carolina, the State must bear the cost of the initial surgery and related expenses, and any subsequent related and

follow-up costs, which may be anticipated to be substantial. Given the State's fiscal condition at present, I believe it would be imprudent to assume these costs in this case.

"Thirdly, Mr. Barnett's wife is disabled and has a learning disabled child. Mr. Barnett and his family are presently covered by his employer's group health insurance plan. Returning Mr. Barnett to South Carolina would result in the loss of his employment, the means of his, and his family's subsistence, and would also cause the loss of the insurance coverage so clearly and desperately needed by this family.

"In light of these, and other factors which weigh against pursuing extradition in this case, I believe my position to withhold my authorization to proceed is justified.

"I appreciate your consideration and your understanding of my decision in this case.

"Kindest regards,

"Carroll A. Campbell, Jr.

"Governor"

Although the Governor of South Carolina specifically declined to accept extradition of this petitioner, citing the petitioner's evident rehabilitation, his familial obligations, and the fact that the State of South Carolina did not want to shoulder the obligation to pay for the petitioner's necessary surgical and medical costs, the Governor did not include in this letter the specific words that this declination of extradition constituted a pardon.

The majority has found that the absence of the word "pardon" means that the petitioner's fugitive status remains intact based upon the constitutional, statutory, and common-law definitions of the term "fugitive," leaving this state with no discretion but to turn over the petitioner to South Carolina for justice.

I respectfully disagree and would vote to affirm the judgment of the Supreme Court. None of the law cited by the Governor or the majority in this case deals with a similar situation—where the Governor of the requesting state has affirmatively declined to extradite a fugitive. This case is unique and without doubt one of first impression. It is submitted that the lack of specific precedent governing these unique circumstances should not act as a barrier to the court's obligation to interpret the law and exercise its discretion in light of the facts presented.

The petitioner alleges that he has resided at the same address on Long Island for 23 years. He further alleges that in 1987 he married a woman who had three children from a prior marriage, whom he raised and fully supported. In addition, they had two children together, a son in 1988 and a daughter in

1992. Sadly, the petitioner's daughter has suffered from severe mental health problems for most of her life, including depression with suicidal ideation, and the petitioner urges that given her fragile condition, his extradition would be nothing short of disastrous for her and for his family, who, in addition to dealing with the emotional repercussions, would become public charges without his support. The petitioner's wife is disabled and the family relies upon his health insurance.

The petitioner himself has severe health problems including terminal lung cancer, a chronic cardiac condition, and the after-effects of a stroke. He takes numerous medications daily, yet continues to remain responsible for the support of his family. Notwithstanding his grave health problems, his work history has been consistent. The petitioner alleges that he has been constantly employed for 30 years, always with "on-the-books" jobs, and has paid taxes. In recent years, he served as the Fleet Manager for United Chimney and previously served as the Director of Transportation for over 13 years for the Center for Rehabilitation, a therapeutic facility for disabled persons on Long Island.

There is no indication that he has been anything other than a model parent and husband in the years before the State of South Carolina expressed its disinterest in bringing him back in 1993 and for the 13 years since that declination.

The record does not demonstrate that South Carolina refused to pardon the petitioner. The People merely assert that the Governor of South Carolina denied the petitioner's application for a pardon. However, there is no exhibit anywhere in the record to support this assertion. The only communication from the Governor of South Carolina is the letter cited here.

In fact, the letter from then-Governor Campbell constituted an unqualified de facto pardon. Nowhere in the letter does the Governor reserve the right to extradite the petitioner at a later date, should the State of South Carolina's budgetary concerns alleviate or for any other possible reason. If the Governor intended that this de facto pardon be revokable, he could have so stated in his letter. Had the Governor intended that the petitioner live with the "Sword of Damocles" hanging over his head for the rest of his life, constantly careful not to do any act which might cause the sword to drop and trigger a new extradition proceeding, the Governor could easily have used the term "revokable" in his letter, or even just have concluded that it was his position to withhold authorization for extradition at this time, rather than the wording that he did use, which was not in any way temporally qualified.

In fact, the record clearly demonstrates that after the then-Governor of South Carolina put in writing that he did not seek the petitioner's extradition, the State of South Carolina showed no interest whatsoever concerning this petitioner's whereabouts or whether any of the conditions that had motivated then-Governor Campbell to decline extradition had changed. Had the petitioner's name not have come up on a computerized list as having an outstanding warrant, upon his re-entry into this country from Jamaica, West Indies, where he had attended a family wedding, there is no reason to believe that South Carolina's current governor would have ever given a moment's thought to bringing the petitioner back to that state.

No case cited by the Governor or by the majority deals with a circumstance where the requisitioning state affirmatively asserted that they did not seek to retain a fugitive after a person has been brought before a court in an asylum state to answer in extradition. There is no recorded case that holds that once a state has declared that it does not want the fugitive returned to it (and particularly where this is due to the fugitive's rehabilitation and the state's reluctance to assume the expense of caring for the fugitive's health problems), that such an individual remains a fugitive, subject to the whims of any person who may at any time in the future sit in the governor's chair. Such a holding would inflate form over substance to the point of absurdity, as intrinsic to the idea of fugitive status in all the case law on this subject is the notion that the state from which the fugitive fled consistently desired his return, if not by actively searching, at least passively.

The facts surrounding *People ex rel. Harris v Mahoney* (198 AD2d 466 [1993]) reveal that in 1967 then-Governor Nelson Rockefeller signed an extradition warrant to return James Harris to the state of Alabama, from where he had escaped, after sentencing, in 1964. Harris was arrested on that warrant in 1970, and in 1971 Governor Rockefeller recalled his warrant and a habeas corpus proceeding was dismissed. It was not until 1990, when Harris was rearrested for attempted sale of a controlled substance in New York, that Alabama renewed its extradition efforts, and issued a fugitive warrant. Then-Governor Cuomo signed the warrant, unbeknownst to Harris, while he was serving his sentence in New York. After finishing his sentence, he was further detained on the extradition warrant, and brought a second habeas corpus proceeding. This Court held that the 1971 dismissal of the warrant by Governor Rockefeller did not preclude Harris from being treated as a fugitive 20 years later because the dismissal of the initial habeas corpus proceeding was not on the merits.

The *Harris* case is utterly distinguishable from the present case because in *Harris* the requisitioning state Alabama never indicated that they no longer sought Harris. Further, in the present case, it really cannot be stated that then-Governor Campbell's refusal to accept extradition was not on the merits, as the Governor fully considered the petitioner's circumstances at that time, including his evident rehabilitation, and "withheld [his] authorization to proceed."

The petitioner urges the position that the status of fugitive generally be considered legally comparable to that of a parolee who left the state without permission. Since a parolee has "served his time" and been released, albeit conditionally, this status should not be considered equivalent to that of a fugitive who has fled the court's justice without having abided the consequences of his crimes. Nevertheless, the facts of this unique case are indeed comparable to cases where the courts have found that the requisitioning state has affirmatively waived the return of a parolee who has left the jurisdiction without permission, since under the facts of the case here, *the requisitioning state gave permission to the petitioner to remain out of prison* by declining to bring him back. Thus, it cannot be truly said that the petitioner's status is comparable to that of a fugitive to whom the state never granted a release, conditional or otherwise, and the only view consistent with the facts of his case is that the State of South Carolina affirmatively waived its interest in the petitioner's return. As stated in *People ex rel. Stracci v Warden of N.Y. City House of Detention for Men* (72 AD2d 393, 397 [1980]), "[e]ach case of waiver must be analyzed on an ad hoc basis. (*see People ex rel. Levy v Dalsheim,* 66 AD2d 827, *affd* 48 NY2d 1019). The crucial event here was the 1976 notification to New York authorities that petitioner was alive and well in Dade County, Florida. Knowledge of the absconder's whereabouts might very well constitute a waiver of the parole violation (*People ex rel. Hensley v New York State Bd. of Parole,* 83 Misc 2d 269; *People ex rel. Grosso v Additon,* 185 Misc 670; *Greene v Michigan Dept. of Corrections,* 315 F2d 546), especially if the knowledge can be shown to have been actual rather than constructive (*Saunders v Michigan Dept. of Corrections,* 406 F Supp 1364), and there is affirmative evidence that the waiver was intentional (*Chapman v State of California,* 423 F2d 682, *cert den* 400 U.S. 960)."

It is submitted that no legitimate purpose would be served by treating this case as a merely ministerial matter and returning this law-abiding, terminally-ill husband and father of a disabled child to a state which long ago determined not to seek his extradition.

In light of the foregoing, the judgment of the Supreme Court sustaining the petitioner's habeas corpus writ should be affirmed. [*See* 13 Misc 3d 247 (2006).]